UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| HUI G. CHEN | : | CIVIL ACTION NO.: |
| | : | |
| VERSUS | : | JUDGE:_____ |
| | : | |
| OCHSNER CLINIC FOUNDATION AND | : | |
| OCHSNER CLINIC, A PROFESSIONAL | : | |
| CORPORATION | : | MAGISTRATE JUDGE:_____ |

**COMPLAINT**

NOW COMES, through undersigned counsel, Plaintiff HUI G. CHEN who respectfully represents the following:

1.

Made defendants herein is

(A)  OCHSNER CLINIC FOUNDATION, a Louisiana Non-Profit Corporation, domiciled and doing business in the Parish of Orleans, State of Louisiana.

(B)  OCHSNER CLINIC, A PROFESSIONAL CORPORATION, a Louisiana Corporation, domiciled and doing business in the Parish of Jefferson, Louisiana.

2.

Defendant is liable for all damages alleged herein.

3.

Defendant is indebted unto plaintiff for all sums as are reasonable under the premises, including but not limited to compensatory damages, special damages, punitive damages, attorney's fees, interest on attorney's fees, costs, with interest thereon from the date of judicial demand until paid pursuant to Title VII of the civil rights act of 1964, 42 U.S.C. § 2000e, et. seq., 42 U.S.C. § 1981 and 42 U.S.C. § 1981(a); Americans with Disability Act; La. R.S. 23:321-325

and 42 U.S.C. § 12101 et. seq La. R.S. 23:303 et. seq.; La. R.S. 23:1361; La. C.C. Art. 2315.

4.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 in that the causes of action outlined herein arise under the Constitution and laws of the United States.

5.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), (2) and (3) in that the events in violation of law occurred in the Parish of Terrebonne and the Defendants principal place of business in Terrebonne Parish, State of Louisiana.

6.

On or about the 15th day of September 2011, Plaintiff was injured in a work related accident and filed a workers' compensation claim. Plaintiff was off of work for approximately two months. After his return, Plaintiff was subjected to systematic and intentional discrimination in direct retaliation and reprisal for having brought a claim of workers' compensation.

7.

Defendant owed a duty to provide a safe environment, free of defects and hazards to patrons, customers and employees, or in the alternative to warn of any defects or hazards and Defendant breached that duty. Defendant's breach of its' duty was a cause in fact of Plaintiff's resulting injuries.

8.

While employed, Mr. Chen was subject to intentional race and national origin discrimination and suffered a severe and pervasive hostile work environment. Mr. Chen complained of the harassment and was retaliated against for his complaints.

9.

Mr. Chen complained of retaliation and harassment and no action was taken by Ochsner to prevent and correct promptly the harassment and retaliation.

10.

Mr. Chen was treated differently than other similarly situated non-Asian employees. He was passed over for advancement and other white employees with less seniority and experience were advanced over Mr. Chen and he was discriminated against and retaliated against because of his disability.

12.

As a result of Defendants' intentional retaliation and discrimination, Defendants are liable unto plaintiff for the following non-exclusive particulars:

- a. Any and all legal damages allowed under the laws of the State of Louisiana;
- b. Loss of wages, earnings and earning potential;
- c. Severe emotional distress;
- d. Pain and suffering;
- e. Great bodily injury; and
- f. Attorney's fees for the handling and prosecution of this matter;
- g. Any penalties applicable under the laws of the State of Louisiana;
- h. Judicial Interest and costs;
- i. Interest on attorney's fees;
- j. Such other acts and omissions as will be shown on the trial, all of which were in contravention of the exercise of due care, prudence, and/or the laws of East Baton

Rouge Parish and the State of Louisiana.

k.      Any and all equitable relief allowed under the laws of this State.

13.

Defendants' actions amount to intentional infliction of emotional distress and caused Plaintiff Chen the damages outlined herein.

14.

The harassment was so severe and pervasive that it constituted a continuing action relating back to the earliest instance of harassment.

14.

Plaintiff was singled out and intentionally discriminated against by the defendants because of plaintiffs' race and national origin in violation of 42 U.S.C 1981 and Title VII of the Civil Rights Act.

15.

Plaintiff is entitled to attorney's fees pursuant to Title VII and 42 U.S.C. 2000e-5(g)(2) and Louisiana Revised Statute Title 23 § 303(A) et. seq., La. R.S. 23 § 967, La. R.S. 23 § 632 along with interest on attorneys fees according to law.

16.

Plaintiff Chen started work for Ochsner, first as an electrician at Brent House Hotel. In April 1994 he transferred to Hospital working on TeleLift system, a large mini automatic "railroad" system to deliver documents, x-ary, etc to various stations in the hospital (behind walls and above ceilings) involves mechanics and electronics but no computer monitors.

17.

In 2005 post Katrina, the hospital became paperless, and gradually eliminated TekeLift

system. Plaintiff Chen was then transferred again to work on the Tube system in 2006 (vacuum tube system similar to that used in drive through banking but with 58 stations all over the hospital to move medicine, patient test specimen, blood, documents etc to various places in the hospital, involve mechanics, electronics, sensors, computer monitors etc.)

18.

In approximately 2010 Mr. Chen provided his home and cell phone numbers to the blood bank manager and told her to call Plaintiff Chen in case of emergency if she could not get a response from other people, she could call Mr. Chen directly anytime whether on call or not.

19.

In 2009-2011 Plaintiff Chen was directed to teach Eric Danos (late 20s, white, electrician) about the tube system.

20.

Then in July 2011, Mike Lawson provided Plaintiff with 5 incident reports alleging low evaluation scores from 2010 in an attempt to intimidate and terminate Plaintiff because Gary (white) and Eric (white) wanted to get rid of the foreigner and replace him with a white guy after 17 years of service.

21.

Plaintiff sprained his ankle on September 14, 2011 4:30PM while repairing a pipe in the ceiling. Plaintiff first called Gary Jallans, the supervisor, in need of a helper, but he said there was no helper. Plaintiff then asked director Mike Lawson for a helper but he did not send anybody. Plaintiff had to fix the heavy pipe in the ceiling on top of a ladder. While repairing the pipe plaintiff fell and sprained his left ankle. The next morning, Plaintiff's ankle was severely swollen and he checked himself into the employee health department. He was wheel chaired to the emergency room

for treatment. There were twenty physical therapy sessions for this injury, the last session was on Feb. 22, 2012.

22.

From September 15, 2011 to November 16, 2011 Plaintiff was on short term disability after he used two weeks of general purpose time then he claimed workers' compensation.

23.

During this time Plaintiff continued to assist employees in the department via telephone with computer and other issues.

24.

On November 21, 2011 Plaintiff signed his 2010 annual evaluation with objections stating he is willing to attend the advance training.

25.

December 5, 2011, Plaintiff received a written warning alleging that there was a communication problem with Plaintiff. Plaintiff is Chinese by birth and has an accent. This is direct discrimination based on Plaintiff's national origin and race.

26.

December 7, 2011, Plaintiff hand-delivered an appeal of the December 5, 2013 written warning to VP Mr. Britcsh, at which time he discussed this issue with Mr. Britsch in his office and told him he thought the treatment was unfair and retaliatory. Plaintiff copied Director Michael Lawson and Alison in human resources, Warner Thomas (COO) and Dr. Quinlan (CEO).

27.

December 7, 2011, Plaintiff's Supervisor Gary became upset with Plaintiff over a mundane

work issue, became very angry pounding on the desk to the point that he knocked his phone off his desk.

28.

December 13, 2011, Plaintiff was on call for tube system and was called in for tube stations 41 and 97 problem. Plaintiff repaired the problems within time limits and then tried to lend a hand try to solve computer communication problems. Plaintiff could not reestablish the communication between observe terminal and main PC for tube operation without a password, Plaintiff made calls to supervisor (Gary) which were not returned. However, tube system operation was not interrupted due to this problem.

29.

December 14, 2011, Plaintiff received another write up from his supervisor for not fixing the computer problems and 'communication' problems further harassing and discriminating against Plaintiff simply because of his race.  In addition, Plaintiff's supervisor made plaintiff's job more onerous requesting that he do more physical activity after his injury.

30.

December 16, 2011, Alison C. Atkinson e-mailed Plaintiff stating that there would be a full investigation into Plaintiff's complaints.

31.

January 9, 2012, Plaintiff received Mr. James P Britsch's response to the December, 7, 2011.

32.

January 12, 2012, Plaintiff visited Human Resources for Defendant to discuss with Alison about the issue.

33.

January 13, 2012, had an appointment at HR to assist the investigation in the Probation appeal with Ms. Karen Judlin.

34.

February 24, 2012, Plaintiff submitted the second appeal to the response to the formal appeal and hand-delivered in person to VP Mr. Bill Ward's office and a copy to Ms. Alison's office.

35.

March 12, 2012, Plaintiff attended a feedback meeting with his supervisor Gary (as part of the corrective actions), asked about when is the advanced training. His response was: I don't know. Therefore, Plaintiff was told to attend advanced training that nobody else had to attend, yet nobody directed plaintiff as to what advanced training actually was.

36.

March 19, 2012, Plaintiff again asked his supervisor Gary when is the advance training. His response was: you need to ask director Mike Lawson.

37.

March 20, 2012, Plaintiff corresponded with Alison in HR for a response to the second appeal and she replied and stated "the Corrective Action stays per policy".

38.

March 20, 2012, Plaintiff called Corporate Integrity office for an appointment to report retaliation, unfair treatment, and bully incidences.

39.

March 21, 2012, Plaintiff talked to Alison in human resources for 15 min, and she gave Plaintiff a copy of Policy 500.9 Formal Appeal. She gave Plaintiff an annual evaluation form and asked me to fill it out and give to director Mike Lawson.

40.

March 23, 2012, Plaintiff talked to Corporate Integrity Officer Ms. Charmel Peterson and explained retaliation, reprisal, unfair treatment and bullying.

41.

March 26, 2012,  When Plaintiff started work at 8:30AM on Monday March 26,2012, he found the tube system in ER was down for over 10 hours. Another employee had been on call. Plaintiff reported this incident to management but no one was written up. Contrast this with December 5, 2011, Plaintiff was issued a written warning when he solved a problem within 30 minutes when he was on call. Therefore, Plaintiff was treated differently than other employees in the same or similar situation.

42.

March 26, 2012, Plaintiff e-mailed documents regarding appeal to Ms. Peterson.

43.

March 28, 2012, Plaintiff e-mailed documents regarding appeal and evaluation to Ms. Peterson.

41.

April 4, 2012, 1:20 PM and 2:15 PM Plaintiff called his Supervisor Gary regarding work related issues.  Gary refused Plaintiff's phone calls.

42.

April 17, 2012, Plaintiff turned in self evaluation forms to director Mike Lawson.

43.

April 18, 2012, Plaintiff found cooked egg yolk in his desk drawer at work as a racist and retaliatory prank.

44.

April 19, 2012, 9:30 AM Plaintiff was called into a meeting and was discharged by VP James Britsch and director Mike Lawson, along with an HR person Bill. During the meeting Plaintiff requested to call his wife to assist him with the technical language in the termination documents. (Plaintiff's wife is a doctor at Defendant Ochsner). Plaintiff was told to bring the documents home and to return all Ochsner's property.

45.

April 20, 2012, Plaintiff called Ochsner CEO and COO's office to make an appointment with CEO or COO. The secretary Rena told Plaintiff that she could not make this appointment because of the current situation, and she "strongly suggest" he get an attorney to contact them.

46.

April 20, 2012, Plaintiff e-mailed Ms. Mollohan, VP in HR, for an appointment; however, Plaintiff did not receive a response.

47.

April 20, 2012, Plaintiff called and talked to Ms. Peterson. She did not know about the discharge and she expressed that other people may not know either. Plaintiff reported to her that he found cooked egg yolk in his desk drawer the day before he was fired. Ms. Peterson instructed Plaintiff to send her a copy of the egg yolk picture so that she could speak with those in the department. Ms. Peterson advised that she needed time to request the documents from the HR department and the others department involved and that Plaintiff could call her on Tuesday the next

week.

48.

April 23, 2012, Plaintiff reported to Ochsner Hospital security to retrieve his personal items. Plaintiff's personal family photo frame glass was damaged.

49.

April 24, 2012, Plaintiff called Ms. Peterson, she asked Plaintiff whether he had turned in the appeal to Alison (HR).  Ms. Peterson stated that she had someone with her in her office and needed to call Plaintiff back.

50.

April 25, 2012, Plaintiff called Ms. Peterson and left message for her to call back.

51.

April 27, 2012, 2:00PM Ms. Peterson called Plaintiff's home phone number and advised she was still working on Plaintiff's files. Ms. Peterson asked whether Plaintiff would appeal and whether Plaintiff was still upset. Ms. Peterson told Plaintiff that his wife should call her next week Tuesday or Wednesday after Ms. Peterson completed the research in this case because she does not understand Plaintiff on the phone.

52.

May 2, 2012, 2:30PM Ms. Peterson stated that she was still researching the matter. She stated that she found miscommunication between Chen and his bosses. She said she was going to go up a level to the risk management department with this issue the following Friday to make sure everyone was treated fairly. She asked Plaintiff to call her on the following Tuesday (12pm-4pm) for results. She advised Plaintiff to go ahead with the appeal if he wanted to since her research results would not

return Plaintiff his job.

53.

Plaintiff was terminated in retaliation for his disability, race and his complaints of discrimination engaging in protected activity.  The retaliatory and discriminatory retaliation is tangible employment action against Plaintiff.

WHEREFORE, Petitioner/Plaintiff Hui Guo Chen prays that this amended petition be deemed good and sufficient with all claims relating back to the date of original filing and that Defendants OCHSNER CLINIC FOUNDATION and OCHSNER CLINIC, A PROFESSIONAL CORPORATION be cited and served with a copy of this petition and after the expiration of all legal delays and due proceedings are had that there be judgment herein in favor of Petitioner/Plaintiff and against Defendant for damages of such type and amounts as this Honorable Court may deem fit and proper in the premises, together with costs, attorneys fees, legal interest and interest on attorneys' fees from date of judicial demand forward along with any other relief justice and equity demand.

Respectfully submitted by:

*/s/Jean-Paul Robert*
Jean-Paul Robert, Bar # 27628
Attorney at Law, L.L.C.
2315 S. Burnside Ave.
Gonzales, LA 70737
Tel:  (225) 647-9200
Fax: (225) 647-9300